ORIGINAL

FILED-USDC-NDTX-DA
'25 JUN 17 PM4:11

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | CASE NO. |
| v. | |
| KHADEER KHAN MOHAMMED (01) | 3-25CR-282 L |

# INDICTMENT

The Grand Jury charges:

At all times relevant to this Indictment:

## Introduction

1. Defendant **Khadeer Khan Mohammed ("Mohammed")** was a citizen of India residing in Irving, Texas, in the Northern District of Texas.

2. American Premier Labs LLC ("American Premier") was an entity owned and controlled by **Mohammed**, which purported to be a clinical laboratory operating in Richardson, Texas. According to the Medicare Provider Enrollment, Chain, and Ownership System ("PECOS"), American Premier was a registered provider with Medicare at all relevant times.

3. From in or around August 2023 and continuing thereafter until in or around October 2024, **Mohammed**, through American Premier, submitted or caused to be submitted to Medicare approximately $93 million in false and fraudulent claims for genetic testing that was never requested, ordered, and/or performed. Medicare paid at least approximately $65 million for the false and fraudulent claims.

The Medicare Program

4. The Medicare Program ("Medicare") was a federally funded program that provided free or below-cost health care benefits to certain individuals, primarily the elderly, blind, and disabled. The benefits available under Medicare were governed by federal statutes and regulations. The United States Department of Health and Human Services ("HHS"), through its agency, the Centers for Medicare and Medicaid Services ("CMS"), oversaw and administered Medicare. Individuals who received benefits under Medicare were commonly referred to as Medicare "beneficiaries."

5. Medicare was a "health care benefit program," as defined by Title 18, United States Code, Section 24(b).

6. Medicare "Part B" was a medical insurance program that covered, among other things, medical services provided by physicians, medical clinics, laboratories, and other qualified health care providers, such as office visits, minor surgical procedures, and laboratory testing, that were medically necessary and ordered by licensed medical doctors or other qualified health care providers.

7. Physicians, clinics, and other health care providers, including laboratories (collectively, "providers"), that provided services to beneficiaries were able to apply for and obtain a "provider number." Providers that received a Medicare provider number were able to file claims with Medicare to obtain reimbursement for services provided to beneficiaries.

8. When seeking reimbursement from Medicare for provided benefits, services, or items, providers submitted the cost of the benefit, service, or item provided together with a description and the appropriate "procedure code," as set forth in the Current Procedural Terminology ("CPT") Manual or the Healthcare Common Procedure Coding System ("HCPCS"). Additionally, claims submitted to Medicare seeking reimbursement were required to include: (a) the beneficiary's name and Health Insurance Claim Number ("HICN"); (b) the date upon which the benefit, item, or service was provided or supplied to the beneficiary; and (c) the name of the provider, as well as the provider's unique identifying number, known either as the Unique Physician Identification Number ("UPIN") or National Provider Identifier ("NPI"). Claims seeking reimbursement from Medicare were able to be submitted in hard copy or electronically.

9. Medicare, in receiving and adjudicating claims, acted through fiscal intermediaries called Medicare administrative contractors ("MACs"), which were statutory agents of CMS for Medicare Part B. The MACs were private entities that reviewed claims and made payments to providers for services rendered to beneficiaries. The MACs were responsible for processing Medicare claims arising within their assigned geographical area, including determining whether the claim was for a covered service.

10. CMS contracted with Novitas Solutions, Inc. ("Novitas") to administer Medicare Part B claim payments in Texas, which included claims for laboratory services. Each time that a laboratory provider submitted a claim to Medicare, the laboratory provider certified that the claim was true, correct, and complete, and complied with all Medicare laws and regulations. The claims were generally submitted electronically.

11. To receive Medicare reimbursement, providers needed to have applied to the MAC and executed a written provider agreement. The Medicare provider enrollment application, CMS Form 855B, was required to be signed by an authorized representative of the provider. CMS Form 855B contained a certification that stated:

> I agree to abide by the Medicare laws, regulations, and program instructions that apply to this provider. The Medicare laws, regulations, and program instructions are available through the Medicare contractor. I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations and program instructions (including, but not limited to, the federal anti-kickback statute and the Stark law), and on the provider's compliance with all applicable conditions of participation in Medicare.

12. In executing CMS Form 855B, providers further certified that they "w[ould] not knowingly present or cause to be presented a false or fraudulent claim for payment by Medicare and w[ould] not submit claims with deliberate ignorance or reckless disregard of their truth or falsity." Medicare would not reimburse providers, including clinical laboratories, for any items or services that were not requested or received.

<u>Genetic Testing</u>

13. Genetic tests were laboratory tests that used DNA sequencing to identify specific inherited mutations in a patient's genes.

14. Genetic tests were performed to identify mutations that could increase an individual's risk of developing various diseases and conditions such as cancer, cardiovascular disease, dementia, Parkinson's disease, and diabetes, or that could increase

susceptibility to adverse drug reactions. Certain types of genetic tests could also assist in the treatment or management of disease.

15. In order to have a genetic test performed, an individual provided a saliva sample using a buccal (cheek) swab, which collected a specimen containing DNA material. The specimen was then transmitted to a laboratory for testing.

16. DNA specimens were submitted to laboratories together with test requisitions that identified the patient, the patient's insurance and other personally identifiable information, the diagnosis purportedly supporting the test, and the specific genes to be examined. In order for laboratories to submit claims to Medicare for genetic tests, requisitions had to be signed by a physician or other authorized medical professional, who attested to the medical necessity of the test. Requisitions with a provider's signature were known as "doctors' orders."

17. Medicare did not cover diagnostic testing that was not "reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member." 42 U.S.C. § 1395y(a)(1)(A). Except for certain statutory exceptions, Medicare did not cover "[e]xaminations performed for a purpose other than treatment or diagnosis of a specific illness, symptoms, complaint, or injury." 42 U.S.C. § 411.15(a)(1).

18. If diagnostic testing was necessary for the diagnosis or treatment of illness or injury, or to improve the functioning of a malformed body member, Medicare imposed additional regulations before covering the testing. Title 42, Code of Federal Regulations, Section 410.32(a) provided that "all diagnostic x-rays tests, diagnostic laboratory tests, and

other diagnostic tests must be ordered by the physician who is treating the beneficiary, that is, a physician who furnishes a consultation or treats a beneficiary for a specific medical problem and who uses the results in the management of the beneficiary's specific medical problem. Tests not ordered by the physician who is treating the beneficiary are not reasonable and necessary."

## The Fraudulent Scheme

19. **Khadeer Khan Mohammed** unlawfully caused to be submitted false and fraudulent claims to Medicare for laboratory testing that, as **Mohammed** knew and intended, were, among other things, ineligible for reimbursement, not requested, and not provided as represented.

20. Over the course of, and in furtherance of the fraudulent scheme, which began in or around August 2023 and continued thereafter until in or around October 2024, the exact dates being unknown to the Grand Jury, **Mohammed** caused American Premier to submit false and fraudulent claims to Medicare in at least the approximate amount of $93 million for genetic testing.

21. As a result of these false and fraudulent claims, Medicare made payments to American Premier in at least the approximate amount of $65 million.

## Object/Purpose of the Scheme

22. The object/purpose of the scheme was for **Mohammed** to unlawfully enrich himself by, among other things: (a) submitting and causing the submission of false and fraudulent claims to Medicare for laboratory testing that was ineligible for reimbursement, not requested, or not provided as represented; (b) concealing the submission of false and

fraudulent claims to Medicare; and (c) diverting proceeds of the fraud for his personal use and benefit, for the use and benefit of others, and to further the fraud.

Manner and Means of the Scheme

23. The fraudulent scheme operated, in substance, as follows:

a. In furtherance of the scheme, **Mohammed** acquired control of American Premier in or around September 2023.

b. In furtherance of the scheme, **Mohammed** opened bank accounts on behalf of American Premier, including at Comerica Bank and Truist Bank, and signed signature cards as the sole signatory.

c. In furtherance of the scheme, **Mohammed** caused the submission of Medicare enrollment forms for American Prime, certifying that he would comply with all applicable Medicare laws, rules, regulations, and program instructions, and that he would not knowingly present or cause to be presented false or fraudulent claims for payment by Medicare, or submit claims with deliberate ignorance or reckless disregard of their truth or falsity.

d. In furtherance of the scheme, **Mohammed** used the personal identifying information of physicians without their knowledge or consent, to cause the submission of millions of dollars in claims to Medicare for genetic tests for beneficiaries and recipients, even though the physicians had no prior relationship with the beneficiaries and recipients, was not treating and consulting the beneficiaries or recipients, and did not use the tests to treat the beneficiaries or recipients.

e. In furtherance of the scheme, in or around August 2023 and continued thereafter until in or around October 2024, the exact dates being unknown, **Mohammed** caused American Premier to submit false and fraudulent claims to Medicare in at least the approximate amount of $93 million for genetic testing, of which Medicare paid more than approximately $65 million. In a single ten-day period in 2023, Medicare paid approximately $13 million for false and fraudulent laboratory test claims submitted by American Premier.

Counts One through Four
Health Care Fraud
Violations of 18 U.S.C. § 1347

24. The allegations contained in the preceding paragraphs of this Indictment are realleged and incorporated by reference as though fully set forth herein.

25. From in or around August 2023 and continuing thereafter until in or around October 2024, the exact dates unknown to the Grand Jury, the defendant **Khadeer Khan Mohammed** did knowingly and willfully devise and execute and attempt to execute a scheme and artifice to defraud a health care benefit program affecting commerce, as defined in 18 U.S.C. § 24(b), that is, Medicare, and to obtain, by means of materially false and fraudulent pretenses, representations, and promises, money and property owned by, and under the custody and control of Medicare in connection with the delivery of, and payment for, health care items, benefits, and services, namely genetic testing.

26. In execution and attempted execution of the scheme and artifice to defraud, defendant **Khadeer Khan Mohammed** submitted or caused to be submitted the following claims on the dates indicated below, each claim constituting a separate count:

| Count | Beneficiary | Claim Number | Date of Submission/ Received (On or About) | Approximate Amount Paid |
|---|---|---|---|---|
| 1 | S.W. | 452824061728240 | 09/04/2023 | $4,217.71 |
| 2 | V.T. | 452924043611440 | 11/10/2023 | $1,101.02 |
| 3 | P.K. | 452924051201800 | 11/20/2023 | $1,101.02 |
| 4 | A.M. | 452824046468050 | 11/28/2023 | $859.72 |

All in violation of 18 U.S.C. § 1347.

<u>Notice of Forfeiture</u>
[18 U.S.C. § 982(a)(7)]

27. The allegations contained in Counts One through Four of this Indictment are realleged and incorporated by reference as though fully set forth herein for the purpose of alleging forfeiture to the United States of America of certain property in which the defendant has an interest.

28. Upon conviction of any violation of any Federal health care offense, including 18 U.S.C. § 1347, the defendant, **Khadeer Khan Mohammed,** shall forfeit to the United States any property, real or personal, that constitutes or is derived, directly or indirectly, from gross proceeds traceable to the commission of the offense, pursuant to 18 U.S.C. § 982(a)(7), including but not limited to the following:

<u>Seized Funds/U.S. Currency:</u>

> $3,005,934.55 in funds seized from Truist bank account #1440019881982 in the name of American Premier Labs LLC;
>
> $2,973,471.76 in funds seized from Comerica bank account #1883303099 in the name of American Premier Labs LLC; and
>
> $3,224.32 in funds seized from Comerica bank account #1883318048 in the name of American Premier Labs LLC.

<u>Cash Proceeds</u>

> The above-referenced property subject to forfeiture includes, but is not limited to, a "money judgment," in United States currency, and all interest and proceeds traceable thereto, representing the remaining amount of proceeds (after deducting the amount already seized) obtained by defendant as a result of the offenses alleged in this Indictment, for which the defendant is personally liable.

Substitute Assets

If any property subject to forfeiture, as a result of any act or omission by defendant:

(a) cannot be located upon the exercise of due diligence;
(b) has been transferred or sold to, or deposited with a third party;
(c) has been placed beyond the jurisdiction of the court;
(d) has been substantially diminished in value; or
(e) has been commingled with other property which cannot be divided without difficulty,

it is the intent of the United States, pursuant to 21 U.S.C. § 853(p), to seek forfeiture of any other property of defendant up to the value of the above forfeitable property, including but not limited to all property, both real and personal, owned by defendant.

A TRUE BILL:

FOREPERSON

NANCY E. LARSON
ACTING UNITED STATES ATTORNEY

RENEE M. HUNTER
Assistant United States Attorney
Texas Bar No. 24072942
1100 Commerce Street, Third Floor
Dallas, Texas 75242-1699
Telephone: 214-659-8600
Email: Renee.Hunter@usdoj.gov

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

---

THE UNITED STATES OF AMERICA

v.

KHADEER KHAN MOHAMMED

---

INDICTMENT

18 U.S.C. § 1347
Health Care Fraud
(Counts 1-4)

18 U.S.C. § 982(a)(7)
Notice of Forfeiture

4 Counts

---

A true bill rendered

DALLAS FOREPERSON

Filed in open court this 17 day of June, 2025.

**Warrant to be Issued**

UNITED STATES MAGISTRATE JUDGE
No Criminal Matter Pending